**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-2473-WJM-MEH

ENGILITY CORPORATION,

      Plaintiff,

v.

CHARLES AARON DANIELS,
RUTHERFORD "CHIP" SURBER, and
DEPLOYABLE TECHNOLOGY SOLUTIONS, LLC,

      Defendants.

---

**ORDER GRANTING PRELIMINARY INJUNCTION IN PART**

---

Engility Corporation ("Engility") brings this action against two former employees
—Defendants Charles Daniels ("Daniels") and Rutherford "Chip" Surber ("Surber")—
and a company they recently formed, Deployable Technology Solutions ("DTS")
(collectively, "Defendants").  Engility claims:

    1.     violation of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C.

        § 1836(b);

    2.     violation of the Colorado Uniform Trade Secrets Act ("CUTSA"), Colo.

        Rev. Stat. §§ 7-74-101 to -110;

    3.     breach of a confidentiality agreement;

    4.     breach of the duty of loyalty;

    5.     tortious interference with contract and prospective economic advantage;

    6.     unfair competition; and

    7.     defamation.

(*See generally* ECF No. 7.)

Currently before the Court is the preliminary injunction portion of Engility's Motion for Temporary Restraining Order and Preliminary Injunction ("TRO/PI Motion").  (ECF No. 9.)[1]  The Court has also received Defendants' Response (ECF No. 22), Engility's Reply (ECF No. 24).  The Court held a Preliminary Injunction Hearing on November 21, 2016, after which it ordered further briefing (*see* ECF Nos. 35, 38, 39).

Having carefully considered all of the briefing and evidence received thus far, and for the reasons explained below in greater detail, the preliminary injunction portion of Engility's TRO/PI Motion is granted in part.  Conditioned on Engility posting a $1 million bond, Defendants are enjoined from disclosing or otherwise making use of Engility's trade secrets, and from competing for certain business for a period of one year beginning (retroactively) on October 4, 2016 expiring on October 3, 2017.

## I.  BACKGROUND

Based on the witness testimony and other evidence received into the record at the Preliminary Injunction Hearing, as well as the parties' filings to date, the Court makes the following factual findings:

### A.    Engility's Business and Daniels' Employment[2]

Engility describes itself as "the top solutions provider of military deployable communications equipment, ranging from collaboration tools such as video teleconferencing and streaming video to common operational picture tools."  (ECF No.

---

[1] The Court previously denied the TRO portion of this motion.  (*See* ECF No. 12.)

[2] The TRO/PI Motion focuses entirely on Daniels' actions and alleged misdeeds.  Surber is barely mentioned.  The Court therefore likewise focuses on Daniels.

11 at 2, ¶ 1.)  As relevant here, Engility says there are "two crucial programs performed by Engility" that fall within this business focus: (1) "the Deployable Communications Capabilities Systems ('DCCS')"; and (2) "the upcoming requirement, Mobile User Objective System ('MUOS')."  (*Id.* at 3.)

DCCS is a "solution" that Engility provides to U.S. Northern Command ("USNORTHCOM"), which is the United States military subdivision responsible for protecting the continental United States and closely related territorial interests.  DCCS comprises equipment (*e.g.*, radio terminals, antennas, satellite dishes, etc.) that Engility procures from third parties and then assembles into an interoperable system that permits the user to accomplish voice and data communications similar to modern cell phone technology, but unconstrained by the need to be near a cell phone tower.  MUOS is, among other things, a new constellation of satellites that provides even greater bandwidth for such communications—what the parties describe as roughly analogous to going from a 3G cell phone network to a 4G network.  Eventually, all DCCS equipment must be able to communicate through MUOS.

Engility says that Daniels was "the 'face' of Engility" to USNORTHCOM.  (ECF No. 11 at 2–3, ¶ 2.)  Specifically, he was "the Technical Program Manager" for Engility with respect to DCCS and, allegedly, MUOS.  (*Id.*)  "In this position," says Engility, "Defendant Daniels was privy to all of Engility's most sensitive information regarding these programs . . . .  He was also the principal conduit of information from the USNORTHCOM programs back to Engility."  (*Id.*)

Daniels and Surber formed DTS in May 2016—apparently unbeknownst to anyone else at Engility, and allegedly with the intention to "compete separately for the

3

MUOS Procurement." (ECF No. 7 ¶ 15.)

**B.    Daniels' Confidentiality Agreement**

Engility is the successor-in-interest to a division of L-3 Communications. (*Id.* at 3

n.1.) When Daniels was hired by L-3, he signed an "Employee Confidentiality and

Innovation Agreement" ("Confidentiality Agreement"). (*See* Plaintiff's Exhibit 1.)[3] The

Confidentiality Agreement protects "Proprietary Information," defined as

> all trade secrets, know-how and other information that
> relates to the business of L-3 and is not generally available
> to the public or generally known in the industries in which
> L-3 does business or may become engaged, including,
> without limitation, any formulas, devices, inventions,
> methods, techniques or processes, compilations of
> information, records and specifications that are owned or
> licensed by L-3 and used in the operation of L-3's business
> and any other information of L-3 relating to its services and
> products (offered or to be offered), research, development,
> marketing, pricing, clients and prospective clients, business
> methods, strategies, financial condition, plans, personnel
> information and capabilities, policies or prospects.

(*Id.* ¶ 4.) The Confidentiality Agreement also protects "L-3 Materials," meaning "[a]ll

files, records, proposals, specifications or other documents, and all computer software,

software applications, files, databases and the like relating to L-3's business or which

contain Proprietary Information." (*Id.* ¶ 2.)

In the Confidentiality Agreement, Daniels agreed "to hold all Proprietary

Information and L-3 Materials in strict confidence," and agreed not to "take, use, copy,

disclose, publish or summarize any Proprietary Information or L-3 Materials except to

the extent necessary to carry out [his] duties and responsibilities as an employee of

---

[3] This document is also in the record at ECF No. 7-1.

L-3." (*Id.* ¶ 1.)  Daniels further agreed that, upon separation from L-3, he would "promptly deliver to L-3 all L-3 Materials in [his] possession, custody or control," and would not "retain any copies of the L-3 Materials in any form or medium whatsoever." (*Id.* ¶ 2.)

The Confidentiality Agreement explicitly inures to the benefit of L-3's successors (*id.* ¶ 8), so it continues to apply as between Engility and Daniels.

## C.   Daniels' Separation from Engility

The crux of the present proceedings is precisely what Daniels did with Engility data in his possession shortly before and shortly after his final day with the company. The parties have somewhat conflicting stories in this regard.  To understand the Court's eventual decisions regarding which story (or aspects of a story) to believe, the Court finds it helpful to present the parties' various accounts in the chronological order that they were presented to the Court.  As will be obvious below, the change in stories over time is revealing, particularly with respect to Daniels.

### 1.   Engility's Original Story

According to Engility's TRO/PI Motion, Daniels' last day with the company was August 29, 2016; this was also the date on which he returned his company computer, and on which Engility terminated his access credentials to the company network.  (ECF No. 11 at 4, ¶ 6.)  However, on an unspecified date after August 29, Daniels surrendered to Engility a flash drive full of Engility information, but with a "date modified" metadata date of August 30, 2016 as to most of that information.  (*Id.*; *see also* ECF

No. 7-4 at 3.)[4]

From this, Engility inferred that "the contents of the flash drive—which include Engility trade secrets and proprietary information—were copied from a separate copy of the documents, which separate copy has not been disclosed, let alone returned to Engility." (ECF No. 11 at 4, ¶ 6.) Based on that inference, Engility claims that Daniel still has access to:

> • Engility's cost loading process, a proprietary tool by which Engility determines product pricing based on profitability targets and anticipated costs, including employee salaries.
>
> • Profitability information, on the basis of which Engility bids its work for the government.
>
> • Customer contact information and summaries of customer interactions regarding the customers' needs and purchasing goals.
>
> • Engility's contract pipeline and opportunities, as well as documents pertaining to its contracting strategies for the identification of opportunities and the development of bidding strategies.
>
> • Product designs and equipment configuration, including equipment, trailers, and IP schematics for the DCCS program, as well as equipment bundling for routers, switches, cryptographic, radios, VTC Phones, etc.

(ECF No. 7 ¶ 24.)

2.    Daniels' Original Story

In a verified response brief, Daniels originally presented a materially different

---

[4] ECF No. 7-4, p. 3, is a screenshot showing the "date modified" dates on the flash drive. Two of the eight dates shown are September 8, 2016, and September 15, 2016. Engility claims that these files "were opened by Engility employees"—thereby altering the metadata— "before they realized the importance of the metadata on the flash drive." (ECF No. 11 at 4, ¶ 6.)

account.  Daniels says he tendered his two-week notice to Engility on August 15, 2016, and he therefore agrees with Engility that his last day of work was supposed to be August 29, 2016.  (ECF No. 22 at 5.)  However, his supervisor, Jim Appleyard, had asked him "to create on a removable media device a copy of the files Daniels used in his day to day work, and to structure the files in a manner that would be easy for his replacement to follow."  (*Id.* at 5–6.)  Due to more-pressing Engility assignments, Daniels could not complete the flash drive by August 29.  He therefore "informed Appleyard he would be unable to complete the file project that day.  Appleyard directed Daniels to continue working on the files, and to bring in his laptop computer and the [flash] drive as soon as he finished the project."  (*Id.* at 6.)

According to Daniels, he completed the flash drive project the next day (August 30) when he used his Engility-issued MacBook Pro to create a 13–14 gigabyte collection of files that he then copied onto a 16 gigabyte flash drive.  (*Id.* at 6 & n.3.)  Specifically, "[a]ll files Daniels copied to the [flash] drive for Appleyard were either generated on or downloaded onto and copied from this laptop computer."  (*Id.*)  Later that same day (August 30), Daniels physically surrendered the flash drive and his laptop to an Engility employee at an Engility office in Colorado Springs.  (*Id.* at 6.)  The day after that (August 31), Daniels surrendered his company badge and keyfob at another Engility office in Colorado Springs.  (*Id.*)

Given this sequence of events, Daniels argued that the August 30 metadata date on the flash drive is not evidence that he has kept a copy of anything, given that August 30 is the date he finalized the flash drive and then returned all of his materials to Engility.  (ECF No. 22 at 8.)  He admitted, however, that he *did* retain a few allegedly

7

irrelevant files, and a few potentially relevant files, with permission:

> Before returning the laptop, Daniels downloaded a copy of his personal calendar and photos . . . onto [another flash drive] for himself.  He also printed/saved to .PDF files (from the Outlook Express program on the laptop computer) and retained copies of a few e-mails that concerned projects he planned to ask [Engility supervisor Christopher] Wasniak about, along with some personal e-mails (e.g., an e-mail from a customer thanking him for his hard work).  Jim Appleyard gave Daniels consent to retain those e-mails. The e-mails Daniels retained contain 2.91 megabytes of data, and do not contain any Engility trade secrets.

(*Id.* at 7 (footnote omitted).)  Daniels identified the "projects he planned to ask Wasniak about" as "concern[ing] the JFHQ-NCR, JTF-N Garrison Services, and 153rd CACs that Engility claims the Defendants failed to inform Engility about."  (*Id.* at 7 n.4.)[5]  Daniels here refers to an allegation in Engility's Complaint regarding "three support opportunities under the USNORTHCOM umbrella" that Daniels "failed to inform Engility about" before resigning.  (ECF No. 7 ¶ 17.)  Daniels also represented that all of these files, and certain others, were part of a zip file that he placed on the flash drive, and that also remained on his laptop at the time he turned it in.

　　3.　Engility's Reply

Engility's reply brief argued that Daniels' story is false.  Engility proffered still images from surveillance camera footage showing that the surrender of company property Daniels says he performed on August 30 was actually performed on August 29—save for surrender of the flash drive, which happened on August 31.  (*See* ECF Nos. 24-1, 24-2.)  Engility's records also described *two* laptops that Daniels

---

[5] Although the Court has received a glossary explaining what these alphabet-soup acronyms stand for, no party has explained what they really mean.

surrendered on August 29.

According to Andrew Reisman, a computer forensics expert retained by Engility, the *first* laptop (the MacBook Pro from which Daniels allegedly copied the files onto the flash drive) shows "no evidence of activity on the device, whether by Mr. Daniels or otherwise, after November 2015." (ECF No. 24-7 ¶ 7.)  The second laptop (a Dell model) shows no activity after August 23, 2016, but multiple flash drives were inserted into that laptop between May 2016 and August 2016.  (*Id.* ¶¶ 8–10.)

In addition, Appleyard denied giving Daniels permission to keep any e-mails, personal or otherwise.  (ECF No. 24-5 ¶¶ 3–4.)

4.   Pre-Hearing Discovery

The parties apparently conducted some amount of discovery before the Preliminary Injunction Hearing.  The Court is only aware of this discovery to the extent it was discussed at the Preliminary Injunction Hearing.  The Court's understanding is as follows.

Soon after Engility filed its reply brief, Defendants communicated to Engility that the MacBook Pro sent to Reisman—apparently a 17-inch model—was not the MacBook Pro Daniels had turned in at the end of his employment.  Engility therefore sent the only other two MacBook Pro laptops in its storeroom to Reisman, both of which were 15-inch models.  Reisman examined those laptops.  On one of them he found a user profile for Surber, and otherwise found nothing of interest to the current proceedings.  On the other, he found that it contained little more than the operating system files, and that a hard drive partition had been "wiped," *i.e.*, overwritten with zeros.  Reisman could not be sure how much had been wiped by the user because the hard drive could have come

from the manufacturer with all zeros written on its unallocated space.  In that instance there would be no way to distinguish between zeros that resulted from user-directed overwriting and zeros that had been there all along.

In any event, Daniels was confronted with Reisman's findings at a deposition he agreed to sit for on November 18, 2016.  Daniels agreed that the MacBook with a wiped partition was the one he turned in when he left his employment at Engility.  As far as the Court understands, when Daniels was asked why the partition was wiped, Daniels explained that he had used the laptop to assemble the files needed for the flash drive project, then copied all of those files onto an external hard drive (not a flash drive), then wiped his user profile from the laptop (for unexplained reasons), and then copied the files on the external hard drive back onto the laptop.  Finally, he copied those same files from the laptop onto the flash drive, and ultimately turned in both the laptop and the flash drive to Engility.  It is not clear whether the deposition addressed the fate of the external hard drive.

At his deposition, Daniels was also confronted with the video stills purporting to show that he had turned in his laptop on August 29, not August 30.  Daniels insisted that the date and time stamp on those stills must be wrong, and he requested a chance to watch the relevant surveillance video for August 29, August 30, and August 31.  He received that video later the same day, after the deposition had ended.  His reaction to the video came out for the first time, apparently, during the Preliminary Injunction Hearing.

5.    The Preliminary Injunction Hearing

a.    *Daniels' Post-Separation Possession of Engility Materials*

At the Preliminary Injunction Hearing, Engility called Appleyard to establish the

August 30 metadata dates on the flash drive.  Appleyard said he was the first to notice

those dates and to bring their potential implications to Engility's attention.  Daniels'

counsel offered nothing to impeach this story or the accuracy of the August 30

metadata.

Engility also called Edward Wright.  Wright was the employee to whom Daniels

admittedly returned all of his company materials.  Wright testified that he received

Daniels' two laptops (the MacBook Pro and the Dell) and most of his other equipment

on August 29, and the flash drive on August 31.  Supposedly the videos show this for

each date, although those videos (Engility's Exhibit 16) are too grainy and shot from too

great of a distance to reveal precisely what Daniels turned in on each date.

In any event, in his own testimony, Daniels announced that the videos convinced

him his memory had been wrong, and that he had indeed turned in his MacBook Pro

*and* the flash drive on August 29.  When asked how he could explain the August 30

"date modified" metadata on the flash drive in light of his new story, he offered a theory

that he conceded was speculation.  Specifically, he stated that all 13–14 gigabytes of

data copied onto the flash drive had been in a zip file (not just a subset of files, see Part

I.C.2, above), and that someone at Engility might have extracted the zip file on August

30, which would result at least in a "date created" date of August 30 as to those files.

Daniels apparently understood, however, that 13–14 gigabytes of compressed data

needs at least an equivalent amount of unallocated space to be successfully extracted,

11

and therefore that amount of data could not be successfully extracted onto a 16 gigabyte flash drive (a fact later confirmed by rebuttal testimony from Reisman). Daniels therefore further speculated that someone at Engility extracted only discrete files or directories, thereby generating the August 30 metadata date as to those files. Daniels offered no other possible explanation.[6]

This testimony somewhat reduced Daniels' credibility in the Court's eyes, but a later admission had an even more damaging effect.  Specifically, Daniels admitted that he did not at first erase the external hard drive mentioned above.  Therefore, after his employment ended, he continued to possess a copy of everything he had placed on the flash drive.  Attempting to explain this conduct, Daniels claimed that he believed his new company (DTS) would become a subcontractor to, or partner with, Engility on certain government contracts, and he therefore asked Appleyard's permission to retain all of the flash drive data (not just 2.91 megabytes of allegedly personal materials) so that he could remain fully informed, or at least be better able to answer questions from Appleyard or from Daniels' successor at Engility.  According to Daniels, in response to his request for permission to retain this larger set of data, Appleyard supposedly said, "Giddy-up," which Daniels interpreted, based on prior experience, to mean that Appleyard approved.  In rebuttal testimony, Appleyard emphatically denied ever giving

---

[6] At closing argument, Daniels' counsel theorized that the flash drive data could have been extracted onto the hard drive of a computer into which the flash drive was inserted on August 30, thereby creating a new metadata date and obviating the problem of not having enough space for extraction.  Although this could indeed have changed the metadata of the copy extracted onto the computer, Daniels presented no evidence that it could change the metadata on the flash drive itself.  All of the evidence regarding metadata was derived by Appleyard from the flash drive, and was unrebutted.  Moreover, there is no evidence that anyone at Engility accessed the flash drive on August 30.  The Court therefore rejects this theory.

Daniels such approval.

Returning to Daniels' story, however, Daniels claimed that he began deleting files from the external hard drive in the early part of September, and he had deleted all of them by the third or fourth week of September.  By this point, he says, he realized that the opportunity to work with Engility would not materialize, and so he no longer had use for the retained data.  Daniels testified that he no longer possesses or controls any Engility data, including the 2.91 megabytes of allegedly personal materials, his only copy of which he recently gave to his counsel.

      b.   *The Flash Drive Contents*

Concerning what Daniels retained (at least for a few weeks), Engility offered a sampling of what had been on the flash drive—and therefore what had been on Daniels' external hard drive.  Much of this was offered through Engility's Exhibit 38, which has been designated "Highly Confidential," and the testimony regarding which the Court ordered would be subject to Restricted Access, Level 1.  *See* D.C.COLO.LCivR 7.2(b).  The Court will therefore not discuss the testimony or documents in any detail. The Court is satisfied, however, that the documents contain  sensitive information, such as internal pricing and competition strategies.  Although Daniels testified that certain parts of Exhibit 38 had been disclosed to the public generally, the Court is nonetheless convinced that other parts contain sensitive, internal information and that Engility would reasonably view as proprietary.

      c.   *Competition for MUOS*

Engility is most worried about Defendants competing for MUOS-related contracts from USNORTHCOM.  On this issue, the evidence at the Preliminary Injunction Hearing

essentially tracked the parties' positions in their briefs.  Engility claims that Daniels was intimately familiar with Engility's plans to pursue MUOS contracts.  Daniels responds that neither he nor Engility knew anything of importance regarding USNORTHCOM's plans for MUOS.  Moreover, says Daniels, although Engility procured certain equipment for USNORTHCOM to be used in testing MUOS capabilities in Alaska, Engility was no more than a procurement agent under the auspices of its DCCS contract—a convenient path for USNORTHCOM to draw upon rather than going through the allegedly cumbersome process of procuring the equipment directly.  Engility allegedly had no participation in the equipment's actual testing in Alaska, save for Surber's coincidental presence at the same facility in Alaska where the testing was taking place.

Engility disputes this, claiming that Surber and Daniels were directly involved in the testing.  The Court notes, however, that the firmness of USNORTHCOM's plans for MUOS (or lack thereof) is not directly relevant to whether Daniels is aware of Engility's plans to *compete* for MUOS contracts.  In that regard, Daniels nowhere rebutted Engility's evidence that those plans exist and that he understands them.  The Court accordingly finds on this record that Daniels is, as alleged, familiar with Engility's MUOS-related business plans.

## II.  PRELIMINARY INJUNCTION STANDARD

### A.   The Various Standards

In a sense, there are at least three preliminary injunction standards.  The first, typically-quoted standard requires: (1) a likelihood of success on the merits, (2) a threat of irreparable harm, which (3) outweighs any harm to the non-moving party, and (4) that the injunction would not adversely affect the public interest.  *See, e.g.*, *Awad v. Ziriax*,

670 F.3d 1111, 1125 (10th Cir. 2012).

If, however, the injunction will (1) alter the status quo, (2) mandate action by the defendant, or (3) afford the movant all the relief that it could recover at the conclusion of a full trial on the merits, a second standard comes into play, one in which the movant must meet a heightened burden.  *See O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (*en banc*).  Specifically, the proposed injunction "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course" and "a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."  *Id.*

On the other hand, the Tenth Circuit also approves of a

> modified . . . preliminary injunction test when the moving party demonstrates that the [irreparable harm], [balance of harms], and [public interest] factors tip strongly in its favor. In such situations, the moving party may meet the requirement for showing [likelihood of] success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.

*Verlo v. Martinez*, 820 F.3d 1113, 1128 n.5 (10th Cir. 2016).  This standard, in other words, permits a weaker showing on likelihood of success when the party's showing on the other factors is strong.  It is not clear how this standard would apply if the second standard also applies.

In any event, *"a preliminary injunction is an extraordinary remedy,"* and therefore "the right to relief must be clear and unequivocal."  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

15

**B.      Does Any Modified Standard Apply?**

Engility requests that Defendants be

enjoined, restrained and prohibited, directly or indirectly, from:

1.  Disclosing, using, and/or otherwise making publicly available for any purpose any documents and information they obtained as a result of their employment with Engility and all documents and information derived therefrom (the "Materials"), whether in original, copied, computerized, handwritten, physical, intangible, or any other form;

2.  Destroying, erasing or otherwise making unavailable for further proceedings in this matter, the Materials, any related metadata, or any other evidence concerning any of the events alleged in the Amended Complaint in this matter [although not without first submitting all electronic devices in Defendants' possession or control for forensic imaging, as discussed in Part III.F, below];

3.  Accepting any award of USNORTHCOM business opportunities obtained by Defendants since their misappropriation of the Materials.

(ECF No. 9-1 at 2.)

Defendants claim that Engility's requested injunction falls under the stricter *O Centro* standard for injunctions that mandate action or would provide all the relief Engility might seek at the conclusion of a full trial on the merits.  (ECF No. 22 at 3, 13–15.)[7]  To the extent Defendants direct this argument at Engility's first and second requests, the Court rejects the notion that those requests would give Engility all the relief it might seek after trial.  The Court further rejects the notion that a requirement to erase trade secrets is the sort of mandatory action that the stricter *O Centro* standard

---

[7] Defendants do *not* argue the "alter the status quo" prong.

was meant to address.

Engility's third request, however, gives the Court pause, particularly on the question of whether it grants Engility all the relief it could seek after prevailing at a full trial on the merits.  But the Court agrees with Engility that, as the case currently stands, its defamation and tortious interference claims would remain for adjudication regardless of what the Court orders here.  Specifically, an order preventing Defendants from accepting USNORTHCOM business would not ensure that USNORTHCOM would award such business to Engility.  If Defendants' alleged ill-speaking of Engility prompted USNORTHCOM decision to award that business to some third party, Engility may still have a defamation or tortious interference claim for damages against Defendants.  Thus, the typical preliminary injunction standard applies.

## III.  ANALYSIS

### A.   Likelihood of Success on the Merits

Engility stakes its preliminary injunction only on three of its causes of action, namely, for violation of the DTSA, violation of CUTSA, and breach of the Confidentiality Agreement.  The Court finds that it need only address the alleged DTSA and CUTSA violations.

### 1.   Relevant Definitions

"Trade secret," for DTSA purposes, is defined as follows:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically,

photographically, or in writing if—

     (A) the owner thereof has taken reasonable measures to keep such information secret; and

     (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3).

CUTSA defines "trade secret" as "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value."  Colo. Rev. Stat. § 7-74-102(4).  CUTSA, like the DTSA, requires that the owner of the trade secret must take steps to shield the information from public knowledge: "To be a 'trade secret' the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes."  *Id.*

With the exception of a few specific documents that Court finds irrelevant for present purposes, Daniels does not challenge Engility's assertion that the information to which Daniels had access, and allegedly retained, contains trade secrets as defined under the DTSA and CUTSA.  The Court therefore finds as much.

     2.   <u>Do Defendants Continue to Possess Engility Trade Secrets?</u>

Daniels insisted at the Preliminary Injunction Hearing that neither he nor anyone associated with DTS continues to possess or control Engility trade secrets.  The Court

18

is frankly skeptical.  This skepticism began with Daniels' response brief, which nowhere directly denied containing a copy of the materials found on the flash drive.  He instead proffered facts to refute the inference that an August 30 metadata date necessarily meant he had accessed some personal copy of the relevant information, and he asserted that "Engility has not provided any evidence that the Defendants have possession of any of its trade secrets." (*See* ECF No. 22 at 5, 6 & n.3, 8, 11.)[8]

This lack of direct denial piqued the Court's suspicion, and the Preliminary Injunction Hearing did not help Defendants' cause.  As noted above, the Hearing revealed that nearly every aspect of Daniels' original story was either false or materially incomplete, forcing Daniels into explanations that smack of one trying to escape a lie. The Court finds the following most notable.

First, Daniels forthrightly admitted that he was wrong about turning in his MacBook Pro and flash drive on August 30.  This admission, although commendable, left Daniels unable to explain the August 30 metadata other than through his self-described *speculation* about a file extraction scenario that a 16 gigabyte flash drive could not have accommodated absent the user's decision to extract individual files or directories—of which there is no evidence.  Indeed, there is no evidence that the entire contents of the flash drive were ever compressed.  Prior to the Preliminary Injunction Hearing, the only claim to compression Daniels made was regarding the 2.91

---

[8] In briefing, Defendants' clearest near-denial is to state generically (in the balance-of-harms section of their response brief) that "Defendants do not have possession of Engility's trade secrets." (ECF No. 22 at 17.)  But this statement is still ambiguous.  The Court could not be sure whether Defendants meant to say that they do not possess any of the data also found on the flash drive, or that they do not possess anything they deem to be a trade secret—two very different meanings.

megabytes he previously admitted to retaining, which he described as deriving from a discrete zip file containing his work e-mails, which zip file he placed on the flash drive.

Second, Daniels explained the wiped partition on his MacBook Pro by claiming that he erased his user profile, then copied files back onto the partition, then copied those files to the flash drive.  But (a) there is no evidence that those files were actually copied back onto the MacBook Pro (according to Reisman, they are not there anymore, if they ever were), and (b) Daniels never attempted a reasoned explanation for this cumbersome and, at best for Daniels, highly unusual procedure.  In particular, Daniels nowhere explained why he needed to erase his user profile at all (apparently Surber did not), much less irretrievably erase it by overwriting the partition with zeros.

Third, Daniels never revealed until the Preliminary Injunction Hearing that the materials which eventually made it onto the flash drive also remained on his external hard drive, in his possession, for at least three to four weeks after his departure from Engility.  And Daniels' explanation for keeping those files on his hard drive—that Appleyard gave permission—is facially not credible.  In the Court's view it simply defies belief that Appleyard would allow Daniels to keep a copy of such a large collection of sensitive Engility information, even for the alleged purpose of potentially partnering with or subcontracting from Engility.

Given this, the Court cannot at this time credit Daniels' representation that he and DTS possess no Engility data.  The Court instead finds that Engility is likely to succeed in proving that Daniels still possesses that data in some form.

3.    Do Daniels' Retained Files Contain Trade Secrets?

Assuming that Daniels continues to possess Engility data, the next question is

whether that data qualifies as a trade secret.  As discussed previously, both the DTSA and CUTSA require steps to restrict access to information before it may be deemed a trade secret.  The Court is satisfied that at least a fair portion of whatever Daniels may retain qualifies as an Engility trade secret.  Accordingly, the Court finds that Engility is likely to succeed in proving that its trade secrets have been misappropriated, including trade secrets related to potential MUOS business from USNORTHCOM.

        4.    <u>Can the Court Enjoin Acceptance of USNORTHCOM Business?</u>

All of the foregoing would be more than enough to grant Engility's request that Defendants be enjoined from disclosing trade secrets.  A more difficult question, however, is whether the Court can enjoin Defendants from accepting USNORTHCOM business.

Under the DTSA, the Court cannot grant an injunction that "prevent[s] a person from entering into an employment relationship," and the Court can only place conditions on employment "based on evidence of threatened misappropriation and not merely on the information the person knows."  18 U.S.C. § 1836(b)(3)(A)(i)(I).  There is no indication that "employment relationship" encompasses the role of an outside contractor, as DTS would be to USNORTHCOM if awarded a contract.  Thus, the Court finds that this particular restriction does not apply in the present circumstances.

However, the DTSA further forbids an injunction that would "conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business."  *Id.* § 1836(b)(3)(A)(i)(II).  This raises questions discussed below regarding Colorado's statutory restrictions on noncompete provisions.

Before turning to those statutory restrictions, the Court notes that CUTSA has a

much less specific provision (as compared to the DTSA) regarding injunctive relief:

"Temporary and final injunctions including affirmative acts may be granted on such

equitable terms as the court deems reasonable to prevent or restrain actual or

threatened misappropriation of a trade secret." Colo. Rev. Stat. § 7-74-103.  However,

the Court is confident that one may not obtain by way of an injunction what one could

not obtain in a contract, and, as noted, Colorado has statutory restrictions regarding the

scope of contractual noncompete agreements.  Therefore, the Court cannot issue an

injunction that effectively creates a statutorily disapproved noncompete restriction.  By

implication, then, CUTSA probably has the same sorts of restrictions as the DTSA.

As for Colorado's statutory noncompete restrictions, Colorado presumptively

invalidates noncompete agreements, subject to an important exception that conceivably

applies here:

> Any covenant not to compete which restricts the right of any
> person to receive compensation for performance of skilled or
> unskilled labor for any employer shall be void, but this
> subsection . . . shall not apply to:
>
> * * *
>
> (b) Any contract for the protection of trade secrets . . . .

Colo. Rev. Stat. § 8-2-113(2).

To be clear, this statute does not *directly* apply to this case because there is no

covenant not to compete.  However, it does appear to be an "applicable State law

prohibiting restraints on the practice of a lawful profession, trade, or business," 18

U.S.C. § 1836(b)(3)(A)(i)(II), and therefore appears relevant to any consideration under

the DTSA of whether the Court may enjoin Defendants from accepting USNORTHCOM

business.  At a minimum, § 8-2-113(2) appears to express Colorado's policy in this circumstance, even if no actual written covenant not to compete was executed by the parties.  And again, with respect to CUTSA, it would be incongruous if the Court could create, by judicial fiat, a noncompete restriction that would not survive § 8-2-113(2) if it appeared in a contract.  Thus, the Court must consider § 8-2-113(2) in the CUTSA context as well.

Based on all of the foregoing, the Court is persuaded that it may only enjoin competition or solicitation if, and to the extent, necessary to protect trade secrets.  Having carefully considered the matter, the Court finds that a noncompete injunction is appropriate under the circumstances.  For the reasons already stated in Part III.A.2, above, the Court does not find Daniels credible and can only assume, on this record, that Daniels still retains some portion of Engility's trade secrets.  Indeed, Daniels has demonstrated a propensity for making surreptitious copies of the relevant data, and the Court simply cannot trust Daniels' representations that no further copies exist.  Thus, to prevent Defendants from taking advantage of trade secrets in their possession, the Court finds that an injunction against soliciting or competing for USNORTHCOM is appropriate.  The precise scope of the injunction is discussed below at Part III.F.[9]

**B.      Irreparable Harm**

Engility argues that "misappropriation of trade secrets causes irreparable harm as a matter of law."  (ECF No. 11 at 10.)  Engility cites certain cases for this proposition (*see id.*), but none of them actually comes to this conclusion.  Engility's cases are either

---

[9] Given this analysis, the Court need not reach Engility's arguments regarding "inevitable disclosure."  (*See* ECF No. 38 at 7–9.)

about copyright law (not trade secrets), or involve a situation where trade secrets were about to be publicly disclosed, not just misused by a former employee.

Nonetheless, the Tenth Circuit excuses the irreparable harm requirement when the evidence shows that a defendant is or will soon be engaged in acts or practices prohibited by statute, and that statute itself provides for injunctive relief to prevent such violations. *See Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651 (10th Cir. 2004); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001); *Atchison, Topeka & Santa Fe Ry. Co. v. Lennen*, 640 F.2d 255, 259 (10th Cir. 1981). Because both the DTSA, 18 U.S.C. § 1836(b)(3)(A), and CUTSA, Colo. Rev. Stat. § 7-74-103, provide for injunctive relief to prevent misuse of trade secrets, irreparable harm presumptively exists if Defendants have misused, or are likely to misuse, trade secrets. The irreparable harm element thus automatically favors Engility.[10]

## C.   Balance of Harms

Defendants argue that "the harm to . . . them [of an injunction] will be far greater than any threatened injury to Engility" because "the Defendants do not have possession of Engility's trade secrets, and are not competing to acquire any business that Engility either has or is in a position to obtain." (ECF No. 22 at 17.) This argument is misplaced. The Court would not be reaching the balance-of-harms question without finding a likelihood of success regarding trade secret misappropriation, so it is pointless

---

[10] The Court seriously doubts whether *Star Fuel* and its predecessors remain good law. Later Supreme Court precedent—particularly *Winter v. NRDC*, 555 U.S. 7 (2008), and *eBay v. MercExchange*, 547 U.S. 388 (2006)—strongly suggests that no element of the injunction test should be presumed, thus calling the *Star Fuel* line of precedent into doubt. But the Tenth Circuit has not repudiated that line of precedent, nor has any Supreme Court case overruled it explicitly or by clear implication. The Court therefore is bound to follow it.

to argue that the balance of harm favors the defendant because the defendant is not doing anything wrong.

As to the assertion that Defendants are "not competing to acquire any business that Engility either has or is in a position to obtain," Defendants offered nothing at the Preliminary Injunction Hearing to support this position.

From Engility's perspective, it is losing business on account of a former employee unlawfully using his inside Engility knowledge to outmaneuver Engility. Engility argues that this should necessarily tip the balance of harms in its favor because "[t]he defendants will suffer no harm that is recognized in law if they are prohibited from using information to which they have no legal right." (ECF No. 11 10–11 (quoting *Statera, Inc. v. Henrickson*, 2009 WL 2169235, at *4 (D. Colo. July 17, 2009)).)

With respect to Judge Robert E. Blackburn, author of the *Statera* decision on which Engility relies, the undersigned disagrees that this is the appropriate analysis. Under the reasoning of *Statera*, the balance of harms analysis is superfluous once likelihood of success is established. From the undersigned's perspective, however, balancing of harms remains an independent consideration, even assuming likelihood of success on the merits. In other words, the balance-of-harms element necessarily contemplates the possibility that, in some situations, the harm of an injunction to the defendant is so great that an injunction should not enter, even though the defendant is likely acting unlawfully.

Such a situation does not exist here, however. Defendants have proffered no evidence of harm other than lost USNORTHCOM revenue—currently estimated at $6.1 million in gross revenue for a MUOS-related project, with about 14% of that as profit.

Defendants have not shown that losing such business will cause DTS to fold, or will otherwise put their professional livelihoods at risk.[11]   Accordingly, the Court finds that the balance of harms favors Engility, which stands to lose at least the same amount of revenue to a competitor with a likely unlawful advantage.

## D.   Public Interest

"[T]he public has an interest in protecting valid trade secrets and preventing unfair competition."   *Electrology Lab., Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1165 (D. Colo. 2016).   The Court finds that this is the paramount public interest in these circumstances.

## E.   Bond

The Court must normally impose a bond on Engility as a condition of preliminary injunctive relief.   *See* Fed. R. Civ. P. 65(c).   Engility does not discuss a bond at all in the TRO/PI Motion.   Its proposed order, however, suggests "a nominal bond in the amount of $500.00."   (ECF No. 9-1 at 4.)   This is far too low.   If USNORTHCOM business is valuable enough to litigate over in this lawsuit, it is worth much more than $500 to both parties.

Both parties agree that the most immediately available MUOS-related contract is

---

[11] In their post-hearing supplemental brief, Defendants claim—for the first time and without supporting citations—that an injunction of the scope sought by Engility "will prevent the Defendants from doing any work, either individually, through DTS, or for another contractor that is within the USNORTHCOM area of responsibility, which is all of North America.  Effectively, the Defendants would not be able to work in their chosen profession anywhere in the United States."  (ECF No. 39 at 14.)  If this assertion is true, it was Defendants' duty to develop a supporting factual record either before or during the Preliminary Injunction Hearing. Defendants did not do so, and "argument of counsel is not evidence."  *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009).  The Court accordingly will not consider this assertion.

worth about $6.1 million.  According to Daniels, this would represent gross revenue, while net revenue would be about 14% of that amount ($854,000).  Considering this figure and the monetary stakes generally at issue, the Court finds that a $1 million bond is appropriate.

## F.     Wording of the Injunction

The Court has no qualms with Engility's proposed anti-disclosure language, which would prohibit Defendants from "[d]isclosing, using, and/or otherwise making publicly available for any purpose any documents and information they obtained as a result of their employment with Engility and all documents and information derived therefrom (the 'Materials'), whether in original, copied, computerized, handwritten, physical, intangible, or any other form."  (ECF No. 9-1 at 2.)

As for Engility's request that Defendants be ordered to destroy whatever trade secrets they may have in their possession, this somewhat conflicts with Engility's further desire to obtain complete images of Defendants' various electronic devices— presumably to discover whether Defendants retained other files.  (*Compare id.* at 2 *with* id. at 3.)  The Court will not rule at this time whether Engility is entitled to such imaging. It may be, however, and so the Court finds it inappropriate to include in the injunction a directive to destroy data that may need to be preserved for later discovery purposes.

Finally, regarding the noncompete portion of the injunction, the Court directed both sides to brief the question of substantive, temporal, and geographic scope. Defendants argue that if any injunction is issued, it should be limited "to no more than 6 months in duration, and to government funded efforts related to DCCS or MUOS coming directly through David Banks at USNORTHCOM's offices at Peterson Air Force

Base in Colorado Springs, Colorado that were validated prior to August 29, 2016."
(ECF No. 39 at 13.)  But defendants do not explain who David Banks is,[12] nor why it
would be important to specify where his office is located, nor what it means for a project
to be "validated."  At best, then, this proposal is unhelpful; at worst, the Court suspects
that it would be so narrow as to be meaningless.

Engility, for its part, provides somewhat more detail.  Concerning geographic
scope, Engility proposes the continental United States, Alaska, Hawaii, Puerto Rico,
and the U.S. Virgin Islands, given that this is the scope of its current work with
USNORTHCOM.  (ECF No. 38 at 14–15.)  The Court finds this geographic scope
reasonable under these specific circumstances.

As for temporal scope, Engility proposes two years because this is the time
horizon contained in certain highly confidential planning documents allegedly retained
by Defendants.  (*Id*. at 15–16.)  In the Court's experience, however, two years is
generally at the outer range of what would be permissible in a contractual noncompete
provision running against a former employee.  The Court finds that a one-year term
would be more appropriate in the circumstances.  One year is sufficient time for
information to go stale such that whatever competitive advantage Defendants might
possess will be substantially lessened.  Moreover, the Court finds that this one-year
term should begin to run from October 4, 2016, the day after the date on which
USNORTHCOM cut off its negotiations with Defendants, having learned of this lawsuit.
Before that date, Defendants were improperly taking advantage of trade secrets—or at

---

[12] He was mentioned in the Preliminary Injunction Hearing but his significance remains
unclear.

least Engility is likely to prove as much.  Thus, in equity, the Court cannot set the

beginning of the one-year term any earlier than that.  But, as far as the record reveals,

Defendants have not been taking advantage of trade secrets since that time, and

therefore they one-year term should not begin to run any later than that either.

Finally, as for substantive scope, Engility proposes the following:

> Defendants are enjoined from directly or indirectly, for
> themselves or on behalf of any business entity in any form
> whatsoever, soliciting, accepting, and performing, any
> support work, whether as a prime contractor or
> subcontractor, for the United States Northern Command
> (USNORTHCOM) for Deployable Communications
> Capabilities Systems (DCCS) Lifecycle Configuration
> Management (LCM) requirement, inclusive of Mobile User
> Objective System (MUOS) systems.
>
> For purposes of this injunction, the definition for "support
> work" means providing deployable communications solutions
> (hardware and software), system lifecycle support, project
> management, capability design, system modifications,
> technical refresh, equipment training, technical support,
> service desk, equipment repair, spare parts management
> and general association with the DCCS inclusive of MUOS
> program.
>
> Also for purposes of this injunction, the term
> USNORTHCOM is inclusive of the Service Components
> (i.e., Army North (ARNORTH), Air Force North (AFNORTH),
> Naval Forces North (NAVNORTH), Marine Forces North
> (MARFORNORTH)), mission partners (i.e., National Guard,
> Federal Emergency Management Agency (FEMA),
> Department of Homeland Security (DHS)) and subordinate
> commands (Alaska Command (ALCOM), Joint Task Force -
> Civil Support (JTF-CS), Joint Task Force – North (JTF-N),
> and Joint Forces Headquarters-National Capital Region
> (JFHQNCR)), and USNORTHCOM commanders team, and
> USNORTHCOM Domestic Operations (DOMOPS).

(ECF No. 38 at 17.)  The Court understands the first proposed paragraph, but not the

second and third paragraphs.  In particular, Engility does not explain the various terms

in those paragraphs, nor what the additional specificity adds to the injunction.  The Court will therefore adopt only the first proposed paragraph.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     The preliminary injunction portion of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 9) is GRANTED IN PART;

2.     Conditioned upon Plaintiff posting with the Court a bond of **$1,000,000.00** and providing the Court appropriate notice thereof on or before **December 16, 2016**, Defendants, their agents, and all those actively in concert with them, are PRELIMINARILY ENJOINED as follows:

   a.     Defendants may not disclose, use, and/or otherwise make publicly available for any purpose any documents and information they obtained as a result of their employment with Engility and all documents and information derived therefrom, whether in original, copied, computerized, handwritten, physical, intangible, or any other form; and

   b.     For a period of one year beginning on October 4, 2016, and ending on October 3, 2017, Defendants are enjoined from, directly or indirectly, for themselves or on behalf of any business entity in any form whatsoever, soliciting, accepting, and performing, any support work, whether as a prime contractor or subcontractor, for the United States Northern Command (USNORTHCOM) for Deployable Communications Capabilities Systems (DCCS) Lifecycle Configuration Management (LCM) requirement, inclusive of Mobile User Objective System (MUOS) systems.

30

3.    Plaintiff's requests for expedited discovery and any request to image Defendants'

electronic storage devices (ECF No. 9-1), are DENIED WITHOUT PREJUDICE.

The parties are instead directed to confer in good faith regarding these matters

in an attempt to come to a mutual resolution (which could include an agreement

that some or all of these matters can be addressed through the normal course of

discovery).  To the extent matters remain in dispute, the parties shall submit

those disputes to U.S. Magistrate Judge Michael E. Hegarty, keeping in mind

Judge Hegarty's Practice Standard III.C (concerning prerequisites for discovery-

related motions).

Dated this 2nd day of December, 2016.

BY THE COURT:

_____

William J. Martínez
United States District Judge